UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA

CR. 02-295 (JRT/RLE)

---

United States of America,

Plaintiff,

v.

Michael S. Czichray,

Defendant.

**DEFENDANT'S SUPPLEMENTAL OBJECTIONS TO THE REPORT AND RECOMMENDATION OF MAGISTRATE JUDGE ERICKSON, DATED MAY 2, 2003**

---

Defendant, Michael S. Czichray, through and by his counsel, Peter B. Wold, and in accordance with 28 U.S.C. 626, Local Rule 72.1 (c)(2), and Rule 45 (a), FED.R.CRIM.P., hereby supplements his original objections to the Report and Recommendation of Magistrate Judge Raymond L. Erickson, dated May 2, 2003, as follows:

1. To the recommendation that Mr. Czchray's Motion to Suppress Statements be denied.

A transcript was ordered and is a part of the Court's file.

**The law of the case**

The gateway issue concerns Mr. Czchray's statements to the FBI, which this Court has already suppressed. United States v. Czichray, Crim. No. 01-307 (JRT/FLN) Order Rejecting Report and Recommendation of Magistrate Judge, 2002 WL 54504 (D. Minn. 2002) and United States v. Czichray, Crim. No. 02-295 (JRT/RLE) Memorandum Opinion and Order. Unhappy with this Court's ruling the government appealed. The Eighth Circuit concluded, "the totality of the circumstances in this case leads us to concluded that Czichray was not the subject of custodial interrogation, and that the warnings set forth in Miranda were not required." United States v. Czichray, 378 F.3d 822, 830 (8th Cir. 2004). Mr. Czichray's petition for Writ of Certiorari was denied on May 31, 2005.

We now ask the Court to address whether Mr. Czichray's statements were involuntary under the Due Process Clause, an issue that, as the government's Brief in Opposition to Mr. Czichray's petition for Writ of Certiorari acknowledges, has not been decided.

## THE SETTING

It was the 16th of February, 2001, 4:30 a.m., the morning cold. A telephone call by the FBI; Mr. Czichray answers. The FBI says it has the wrong number, the beginning of their lies. (12.13.2001 Tr. pp. 29-30).[1]

Go to 6:30 A.M. FBI Agent Sean Boylan knocks on Michael Czichray's door, in Columbia Heights, a suburb just north of Minneapolis. The FBI encounters silence, begging the question of who would answer such a knock at that hour. (11.26.2002 Tr. p. 48).[2]

Then a second call. This is Sean Boylan, "Mr. Czichray, you need to answer. You need to come to the door." (JRT Order I p. 2)[3]; (11.26.2002 Tr. pp. 49-50).

To the front door came Czichray wearing underwear, a t-shirt, no sox. (12.13.2001 Tr. p. 31). Here they were, Boylan and fellow Agent Timothy Bisswurm. Credentials out, cards pointed, their first phone call a precursor to their

---

[1] "12.13.2001 Tr." refers to the Transcript of the Motions Hearing before Chief Magistrate Judge Noel held on December 13, 2001.

[2] "11.26.2002 Tr." refers to the Transcript of the Suppression Hearing before Magistrate Judge Erickson held on November 26, 2002.

[3] "JRT Order I" refers to the Order dated by this Court on January 7, 2002.

second act of deceit. "I explained to him," testified Boylan, "that we'd like to take a few minutes of his time. . ." (11.14.2001 Tr. p. 16).[4] (emphasis added); (11.27.2002 Tr. p. 61).[5] Right. Boylan knew Czichray had "other business of the day," business that "he's going to have to take care of." (11.14.2001 Tr. p. 16). For his part, Czichray thought they wanted to make an appointment for an interview, to be conducted later. (12.13.2001 Tr. p. 59).

Little did Czichray know that he would become a prisoner in his own home. Boylan and Bisswurm, not waiting for an invitation, saw his living room and there they would remain, for seven hours. (12.13.2001 Tr. p. 32). Mr. Czichray was asked to sit in a chair he never used, to hear condescending monologue – about search warrants, a fraudulent billing scheme, "the power of the FBI." (12.13.2001 Tr. p. 36). But the FBI had no search warrant.

Isaiah Berlin was right: the essence of freedom is having a choice. See generally, Isaiah Berlin, The Proper Study of Mankind: An Anthology of Essays, Farrar, Straus and Giroux (1998) at 10. Not until Mr. Czichray signed a statement,

---

[4] "11.14.2001 Tr." refers to the Transcript of the Motions Hearing before Chief Magistrate Judge Noel held on November 14, 2001.

[5] "11.27.2002 Tr." refers to the Transcript of the Suppression Hearing before Magistrate Judge Erickson held on November 27, 2002.

written in Agent Boylan's hand, would he be let go, the agents unmindful of Miranda's dictates, willing to coerce.

The opening allegations would last, according to Czichray, until after 9:00 A.M., when he said to Boylan, "I am already late for work. I have to be at work." Boylan responded that they "weren't finished." (12.13.2001 Tr. p. 37). Mr. Czichray was told that he would "not probably be taking care of whatever responsibilities he had for the day." (11.14.2001 Tr. p. 24). Boylan suggested Czichray in fact lie, call work and feign illness, omit FBI mention. (11.27.2002 Tr. pp. 80-81); (12.13.2001 Tr. pp. 37, 63). Mr. Czichray followed orders. For want of a better term, he was unfree.

This was to be the only call Czichray would make. During the seven hours he was otherwise held incommunicado. His employee, Carrie Braun, tried to reach Czichray at 7:30 AM, to discuss the day's appointments. She left a message. (12.13.2001 Tr. p. 66). He would always call back, but not now. (12.13.2001 Tr. p. 67). She called again, at 8:30 AM, at 11:00 AM and so on. "I think I tried a total of like eight or nine times," she said, her testimony not subject to government cross. (12.13.2001 Tr. p. 67).

When the phone rang, Agent Boylan directed, "Don't answer that." (12.13.2001 Tr. pp. 38-39). In addition to the prohibited phone contact, Mr.

Czichray was given no food, nor drink. (12.13.2001 Tr. p. 41). When Czichray left his chair to put on a pair of pants, Boylan followed. (12.13.2001 Tr. p. 41). And when he went to the bathroom, Boylan was at the doorway, asking if he might have a phone where the toilet was. (12.13.2001 Tr. p. 40).

Mr. Czichray was never outside the presence of the Agents. To say they chaperoned him would be too mild. Instead they hovered, they intimidated, and, as this Court found, "the agents' behavior canceled out their verbal assurances that Czichray could refuse to cooperate." (JRT Order I p. 7). The same finding appears in the Court's second Order. (JRT Order II p. 37).[6]

Boylan also told Czichray that if he didn't cooperate, the MRI clinic would be shut down, "[W]e're the FBI, and you don't think if we tell . . . the insurance company not to pay, they're not going to pay you. We'll put you out of business." (12.13.2001 Tr. p. 43). At the motions hearings in Duluth and Minneapolis, the Agents denied the obvious meaning of such statements as recounted by Czichray. (11.26.2002 Tr. p. 60). But, this Court, agreeing with Magistrate Judge Noel, found "Czichray to be more credible than the agents." (JRT Order II p. 18, n. 3).

[6] "JRT Order II" refers to the Order dated by this Court on August 22, 2003.

On the second round of hearings in Duluth, the FBI also denied making this threat: "I know your parents live next door. I know your father is 75 years old. If you do not cooperate, we do not continue, we're going to light up his world; we're going to light up your world." (12.13.2001 Tr. p. 41). In the first motions hearing, Agent Boylan did not mention using the phrase, "light up your world" in his testimony. (11.27.2002 Tr. p. 161). When Magistrate Judge Noel asked Agent Bisswurm what the phrase "light up" Mr. Czichray's life or that of his father's meant, he responded that the phrase was indeed said (disagreeing with Boylan) but it somehow inferred that, "we would need to go and interview those persons to get information relative to our investigation." (12.13.2001 Tr. p. 73).

Czichray: "I don't have very much experience with law enforcement, but if somebody from the FBI comes and tells you that they're going to light up your world, it's a scary thing. They can do anything." (12.13.2001 Tr. p. 61-62). He was right of course. For seven hours, the FBI did anything they wanted; after he refused to cooperate further, the FBI interview of his elderly father took place unannounced, just as they had promised it would. (11.27.2002 Tr. p. 104). The Agents had no evidence Mr. Czichray's father had done anything wrong. (11.27.2002 Tr. p. 102).

Magistrate Judge Erickson denied the motion to suppress and we filed timely objections. After a thorough review of "the transcripts of testimony before both Magistrate Judges" and after a review of "Eighth Circuit case law announced since the ruling in Czichray I," this Court's decision remained the same; suppression of Czichray's statements:

> The Magistrate Judge incorrectly states that this Court "characterized the suppression question as a 'very close issue'" in *Czichray I*. ( R&R at 57 n. 33). This Court made no such statement (in its Order), and did not characterize the overall question of suppressions as "a very close issue."

(JRT Order II p. 17, n. 2). After more than a dozen pages of analysis, the Court's distillation came to this: "Czichray was held in custody on February 16, 2001, that he was improperly denied his Miranda rights, and that he was coerced into signing a waiver of those rights." (JRT Order II p. 17).

## ARGUMENT

**Voluntariness**

The issue now before this Court is whether Czichray's statements, if non-custodial, were voluntarily rendered. The Magistrate suggests no. (R&R pp. 72-73). We disagree.

If a statement is made under a legitimate threat, it cannot be freely given.

See e.g. Arizona v. Fulminante, 499 U.S. 279, 287 (1991); Haynes v. Washington, 373 U.S. 3503, 513-514 (1963). Voluntariness determinations spin about whether the police conduct was coercive and oppressive enough to overbear the will of the suspect, his capacity to resist. Colorado v. Connelly, 479 U.S. 157, 162 (1986); United States v. Pierce, 152 F.3d 808, 812 (8th Cir. 1998). For a confession to be considered voluntary, the Court must determine "'whether a defendant's will was overborne' by the circumstances surrounding the giving of a confession." Dickerson v. United States, 530 U.S. 428, 434 (2000), citing Schneckloth v. Bustamonte, 412 U.S. 218, 226 (1973).

In making this determination the totality of the circumstances are taken into account. United States v. Meirovitz, 918 F.2d 1376, 1379 (8th Cir. 1990), cert. denied, 502 U.S. 829 (1991). Among the factors to be considered are whether the suspect has had experience in the criminal justice system, see Meirovitz, 918 F.2d at 1379; whether a Miranda warning was given, see Withrow v. Williams, 507 U.S. 680, 693 (1993); the length of the interrogation, see Ashcraft v. Tennessee, 322 U.S. 143, 153-54 (1944); and any elements of strong arm tactics and police domination, see Connelly, 479 U.S. at 167.

**Experience**

Prior to Agent Boylan and Bisswrum's interrogation Mr. Czichray had no experience with the criminal justice system. (R&R p. 73).

**Miranda warning**

None.

**Length of the Interrogation**

"The agents first contacted Czichray at 4:40 a.m., when Agent Bisswrum called to see if Czichray was home. The agents rang his doorbell or knocked at 6:30 a.m. When Czichray did not answer, the agents called and instructed Czichray to answer the door." (JRT Order I p. 8). With Czichray at the door Boylan and Bisswrum told him they wanted five minutes of his time. They stayed seven hours.

They lied to Czichray in order to get into his living room. This Court rightly found that the agents' promise that Mr. Czichray could leave at any moment was simply disingenuous. (JRT Order I p. 7). Czichray's movement was restricted to a small chair. He could not answer his calls. He could not even put on a pair of pants without a watchful eye. The FBI even wanted to know if he had a phone in

the tiled room. Note that the door remained open, providing just another action by which the FBI Agents could emphasize their dominance.

Czichray was soon told that his appointments for the day would be delayed, without a time frame set; he became a hostage amorphous to time. This Court concluded in its first Order: "from these circumstances . . . Czichray's freedom of movement was significantly restrained during the interview." (JRT Order I p. 8). Restrained for seven hours. If Czichray's statements were made voluntarily it wouldn't have taken seven hours to produce Boylan's one page confession. Indeed, the agents needed seven hours of complete dominance to overbear Mr. Czichray's will.

**Strong arm tactics and police domination**

The threat was palpable. If Czichray didn't cooperate, the FBI would "light up his life." 'We'll burn you' was the message Czichray heard over and over again. In a paraphrase, 'We're the FBI, and we'll light things up for you, your dad, the rest of your life.' Only a pre-World War II Agent would consider that metaphor appropriate, even usable. It's a symbol of arbitrary government power, of the World Wars' carnage. Not surprisingly, social historians have noted that a burning, whether of a country or a person's life, "destroys irrevocably; nothing

after a fire is as it was before." See e.g. Elias Canetti, Crowds and Power, Noonday Press, (1998) at p. 20.

How does the FBI light up one's life? The phrase has nothing to do with enlightenment, as Agent Bisswurm said, and everything to do with intimidation. Light up one's life means burning Czichray himself, his work, his father; it means his eventual arrest.

Implied threats and strong arm tactics promising eventual ruin if a defendant doesn't cooperate, even if general, negates voluntariness. See Withrow v. Williams, 507 U.S. 680, 684-85 (1993).

This Court agreed:

> . . . [T]he question of strong arm tactics remains a close one. The agents did not threaten Czichray with force or display any weapons, but in addition to the promise to "light up" Czichray's life, they suggested that if he did not cooperate, the FBI would pressure insurance companies to withhold payments from his business. . . . . [T]he court finds Czichray's testimony on this point credible. Strong arm tactics need not be confined to threats of force, and the Court finds that the agents' threats to interfere with insurance payments went too far. See Griffin, 922 F.2d at 1351. Therefore, the Court finds that these threats do constitute strong arm tactics.

(JRT Order II p. 35) (emphasis added).

Once again, this Court chose the testimony of Czichray over the Agents. The government just can't believe the Court would do so.

We acknowledge Courts sometimes allow the government to push around those they interrogate. But Boylan didn't just push, he threatened, first Czichray's father, then his livelihood. A threat this Court has already addressed—stopping various insurance companies from paying for chiropractic services performed by Czichray—"went too far." (JRT Order II at 35).

Most law enforcement agencies use two police officers to dominate the interview. See Miranda v. Arizona, 286 U.S. 436, 452 (1966) (noting law enforcement's historic proclivity toward tandem interviewers, the "friendly and unfriendly," the "mutt and Jeff"). Over thirty years ago, this unfair physical and psychological advantage persuaded the Supreme Court to mandate Fifth and Sixth Amendment warnings as a buffer. Id. at 449-458.

To say in this case "the atmosphere of questioning was not dominated by the two FBI agents" (See Government's Eighth Circuit Brief p. 27), borders on the absurd. What a federal agent describes as voluntary is not determinative. Hanson, 237 F.3d 984 (rejecting agent's contrary testimony in the face of defendant's obvious custody in a jail setting). These agents were matched together for a reason. The Czichray exchange wasn't meant to be an equal tête-à-tête.

The FBI refused to make the record by avoiding use of a tape recorder (11.27.2002 p. 66), which is the great check on police overreaching. Instead of

having all of us reading Boylan's oozy handwriting, we could hear his threats, the FBI's cumulative bravado, the insistence that they could destroy his livelihood, Mr. Czichray's pressured voice, the back and forth responses, words frozen in time. The failure to record is a factor to consider. See Hanson, 237 F.3d at 963 (reversing a lower Court's decision that an interview was custodial, this Court took note that there was "no video or audio record of the conversation."). We would like a portion of this Court's opinion to say the obvious: when quality of an interrogation is in question, a tape recording would remove all ambiguity. If the police are not dominating the interview, then why would they object to a recording?

That is not the way the FBI works, of course. They take advantage of a difference between state and federal law. Compare State v. Scales, 518 N.W.2d 587, 592 (Minn. 1994) (requiring a tape record of defendant interviews), with United States v. Molina, 172 F.3d 1048, 1059 (8th Cir. 1999) (stating law enforcement agents avoid the taping requirement by taking investigations federal).

The dialectic that remains does not satisfy. In federal court, almost every FBI interview and suppressing hearing goes like this: 'we say, he disagrees, and we should win because we have badges.' Agent Boylan's actions canceled any

opportunity Czichray had to make a voluntary statement. Special Agent Boylan has depended on the protection of his badge for too long. It must stop.

## CONCLUSION

This Court's prior rulings, while specifically addressing the issue of custody, have already reached a decision on whether Mr. Czichray voluntarily gave his statement:

> ... Boylan and Bisswurm severely restricted Czichray's freedom within his own home, controlling his movements and preventing him from communicating with anyone outside the house. . . [t]his situation bears a strong resemblance to the type of "incommunicado, police dominated atmosphere" about which Miranda was so "deeply concerned." (citing Griffin, 922 F.2d at 1352). . . . "[A] person can not reasonably expect to be free anywhere if not within the refuge of his home," and the Court finds that Boylan and Bisswurm deprived Czichray of freedom within his own home. (Griffin, at 1355 n. 15).

(JRT Order II p. 37). And,

> The Court finds that Boylan and Bisswurm's heavy-handed domination of Czichray's movements and their preventing him from communicating with others undermined Czichray's consent to enter his home, and negated any promises – no matter how numerous – that the interview would be purely voluntary.

(JRT Order p. 37). As this case illustrates, there is intrinsic value in having an independent judiciary. Agent Boylan's tactics cannot be allowed to continue.

Respectfully Submitted,

Dated: July 18, 2005.

**PETER B. WOLD, P.A.**

**s/ Peter B. Wold**
Peter B. Wold, ID# 118382
Attorney for Defendant
Barristers Trust Building
247 Third Avenue South
Minneapolis, MN 55415
Telephone: 612.341.2525
Facsimile: 612.341.0116