UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
02-295 (03) (JRT/RLE)

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>MICHAEL CZICHRAY,<br><br>Defendants. | POSITION OF THE PARTIES WITH RESPECT TO SENTENCING FACTORS |

The United States of America submits its position with respect to sentencing. The United States accepts the presentence report's factual statements and guideline calculations. The United States objects to any departure or variance downward in this case.

Defendant Czichray now stands convicted in two separate matters, both of which also factually relate to co-defendant Howard Pindyck. As a newly minted chiropractor Czichray associated himself with Howard Pindyck, and quickly became entrenched in a lifestyle that sought to make money through fraud and deceit. Besides opening fraudulent chiropractic clinics, Pindyck and Czichray opened an MRI imaging business (the focus of the bank fraud case), and attempted to become licensed sports agents. Now, at the end of this relationship, Czichray finds himself without his professional license and convicted of multiple felonies.

Czichray's conduct had far reaching impacts. Patients visiting his offices did not receive appropriate or necessary care, the SBA's loan program and insurance companies have sustained substantial financial losses, and the chiropractic profession (an industry continually struggling for acceptance) was again tarred. A just sentence must include a substantial term of prison that recognizes the extensive and pervasive nature of Czichray's criminal conduct, and the substantial harms that resulted therefrom.

**Calculation of Loss Amount**

The principal objection raised by Czichray addresses the PSR's loss calculation. Under the plea agreement, the loss amount related to the health care fraud is disputed. The loss value related to the bank fraud case is also disputed.

1. Health Care Fraud.

During July 2002, the government contracted with an independent auditing firm, Eide Bailly LLP, to conduct an audit of claims submitted by the defendants' chiropractic clinics. The audit focused on claims submitted to five insurance companies: Progressive, MSI, MetLife, Allstate, and State Farm. The audit used a statistically valid sample of randomly chosen claims. The defendants submitted claims to additional insurance companies, but these claims were not included within the target sample for

the audit. Eide Bailly randomly selected a sample of 400 claims from 7,949 patient visits. These claims involved 133 patients.

Although the defendants' fraudulent scheme began in approximately 1996, the audit sample was restricted to claims filed between July 1997 and April 2001. The audit excluded the first year of the defendants' scheme.

When conducting the audit, Eide Bailly discovered "substantial evidence that the documents and claims prepared and submitted by the clinics were abusive and/or fraudulent." EB at 1.1. Eide Bailly discovered numerous additional instances of potential fraud, including instances where:

(1) patient notes reflected treatment for a patient which occurred ***prior to*** the accident that caused the injury (EB at 6),

(2) patient cards which documented when patients appeared at the clinic appeared to be altered or manipulated (EB at 7),

(3) initial consultation notes for ***all*** patients were "almost exactly the same" regardless of the patients' medical condition (EB at 7),

[1] EB at 1 refers to the Eide Bailly audit report, page 1.

(4) progress notes and bubble sheets with pain rating scales all followed exact patterns, regardless of the patients' prognosis (EB at 8),

(5) many patients appeared to have the same handwriting, when signing in on patient sign in sheets (EB at 8), and

(6) the defendants claimed that a 3 year old boy "presented himself for consultation in our office" after a severe car accident, but denied "sexual dysfunction." (EB, Work Papers, Vol II).

Despite overwhelming and conclusive evidence that the patient files were replete with fraudulent and false documents, Eide Bailly assumed, for purposes of the audit, that the files accurately reflected the treatment provided to patients. (EB at 1). In other words, even where the defendants submitted a claim for injuries allegedly sustained ***before*** the car accident (see example 1 above), Eide Bailly treated those injuries as valid and attributable to the car accident.

After examining the 400 claims, Eide Bailly determined that 49% of the claims were fraudulent. (EB at Exh. E).

> The findings were not only extensive and wide-spread, but also did not conform to many of the "usual rules" we tend to follow in the health care arena (i.e. signing documentation, individualizing care, providing care within the Standards of discipline, etc.).

> Conservatively, we recommend that 49% of the total claims that occurred with these 133 patients be denied.
>
> We also found the record keeping containing constant errors and discrepancies. . . . Everything from the sign-in sheets to the visit documentation (or lack of), to the claims themselves were suspect. Again, with the number of discrepancies that were found, it is difficult to establish any credibility in these chiropractic clinics.

EB at 12.

Eide Bailly made this determination by comparing the care purportedly provided to the patients to the standard of practice in the chiropractic community. In essence, Eide Bailly discovered that the defendants were routinely billing for medically unnecessary care, which care was not covered by no-fault insurance policies. Eide Bailly's audit findings directly substantiated evidence provided by clinic employees that the defendants did not care about the patient's condition or prognosis, but were focused on billing insurance companies the maximum extent possible.

After applying the 49% loss rate to the total claim population, Eide Bailly conservatively estimated the loss attributable to the defendants' fraud at $440,311.60. This is a conservative and reasonable estimate of the loss.

With respect to determining loss, "[t]he court need only make a reasonable estimate of the loss. The sentencing judge is

in a unique position to assess the evidence and estimate the loss based upon that evidence. For this reason, the court's loss determination is entitled to appropriate deference." U.S.S.G. § 2B1.1, application note 2(C). "[A]lthough the sentencing court is not expected to determine the fraud rate and attributable loss with precision, it should make a reasonable estimate of the loss, given available information." *United States v. Wells,* 127 F.3d 739, 748 (8th Cir.1997); *United States v. Erhart,* 415 F.3d 965, 970 (8th Cir. 2005). The government must prove the amount of fraud loss by a preponderance of the evidence. *United States v. Coon,* 187 F.3d 888, 899 (8th Cir.1999).

In cases involving repeated and pervasive fraud, a Court may apply a reasonable fraud rate to estimate the approximate losses. The court may base its loss estimate on the approximate number of victims and an estimate of the average loss to each victim. U.S.S.G. § 2B1.1, application note 2(C). In *United States v. Berndt*, 86 F.3d 803 (8th Cir. 1996), the Eighth Circuit recognized that fraud cases involve deceit and secrecy, making it unlikely that the government can always identify the full scope of the offense with specificity. In *United States v. Chichy*, 1 F.3d 1501, 1509 (6th Cir. 1993), the Sixth Circuit approved the District Court's use of "average loss" information to determine the amount of loss. Other cases note that a sentencing court may

calculate loss by making a reasonable estimate of the range of the loss. See *United States v. Narvaez*, 995 F.2d 759 (7th Cir. 1993); *United States v. Brandon*, 17 F.3d 409, 457 (1st Cir. 1994); *United States v. Gomez*, 31 F.3d 28 (2d Cir. 1993); *United States v. Sutton*, 13 F.3d 595 (2d Cir. 1994).

Statistically valid samples are an appropriate means to determine loss in a fraud case. *United States v. Scalia*, 993 F.2d 984, 989 (1st Cir.1993); *United State v. Rostoff*, 53 F.3d 398, 407-408 (1st Cir. 1995) (bank fraud); *United States v. McAlpine*, 32 F.3d 484 (10th Cir. 1994); *United States v. Sutton*, 13 F.3d 595 (2d Cir. 1994) (bribery).

The sample used in this case was a random sample targeting all claims submitted by the defendants to five insurance companies. This audit conservatively estimated the losses caused by the defendants in that:

(1) It only examined claims from 5 insurance companies, instead of all insurance companies to whom the defendants submitted claims;

(2) It did not examine claims from 1996 to 1997; and

(3) It assumed that the patient files accurately reflected the treatment provided to patients, despite overwhelming evidence that the patient notes were false and fraudulent.

Attached to this paper is Eide Bailly's summary report of its audit. The government will present evidence at the sentencing hearing to establish the loss amount attributable to the defendants.

2. Bank fraud.

Defendant Czichray objects to the inclusion of bank fraud losses in this case. The sole reason for the extended delay has been Czichray's request to delay sentencing pending resolution of the health care fraud case. As of the date of sentencing, the victim, Wells Fargo Bank, has been deprived of $193,000. Czichray pledged inadequate collateral for the fraudulently obtained loan. U.S.S.G. § 2B1.1 allows for a credit against loss based on the value of the collateral. Because the loan has defaulted, the bank now has an accurate valuation for the collateral. Czichray complains that at the time of trial, there was no loss. However, at the time of trial, the bank had not defaulted the loan, and thus did not have an adequate valuation of the collateral. Therefore, the bank's loss should be included for purposes of sentencing and resitution.

## **Conclusion**

Michael Czichray engaged in a pervasive and long lasting fraud scheme that targeted insurance companies, banks, and his patients. Therefore, a sentence within the guideline range is appropriate.

Dated:

Respectfully submitted,

RACHEL K. PAULOSE
United States Attorney

*s/ Erica H. MacDonald*

BY: ERICA H. MACDONALD
Assistant U.S. Attorney